We'll start right away with the United States v. Dupigny, 21-1656. Good morning. My name is Beverly Van Ness and I'm here on behalf of Mr. Dupigny. My client is serving a 25-year sentence for trafficking two minor women, one of whom was 16 and one of whom was 17. This was based solely on their age, not on the abuse of force. The first girl was 16 and one was his girlfriend. She testified as his brother, an operating witness testified, as his mother testified. She stayed with his mother for quite a while after he was arrested for free. And they had a romantic relationship. Let me interrupt for just one second. You said without use of force. Didn't the record show that he had displayed a gun to one of the victims at one point because she was not available to provide the services he had promised? She testified that he displayed a gun. However, that was one woman, Centoro, who had an abuse of force allegation as well as minor status, and he was acquitted of that. So his conviction had nothing to do with abuse of force. There was testimony to the effect that he had displayed a gun. I mean, the acquittal could have occurred for any number of reasons, isn't that right? Well, the judge hypothesized that it was based on a lack of evidence, which I discounted in my brief. But there was many reasons why the testifying girls were – their credibility was assessed at uncertain points. Clearly, their testimony satisfied the conviction on reasonable doubt, but that doesn't mean that everything that came out of her mouth has to be accepted by the court. That is establishing on reasonable doubt. And Teja, his girlfriend, actually made several claims that were undercut by other witnesses, minor witnesses. I didn't mean to derail you here. I just wanted to clear that up. Thank you. In any event, Teja was 16 at the time and Centoro was 17. And there was evidence that both girls, including Diamond, that resulted in the acquittal of the third girl, had been prostitutes for quite a long time with several different men. And I'm not saying that to excuse my client's conduct, but simply as a statement of fact. They were experienced prostitutes before they met him. He didn't coerce them into becoming prostitutes. They knew the ropes. Teja, in fact, although she denied it – and this is an example, Judge, of where her credibility was impeached – she denied knowing how to post ads on Backpage. But Shanil, who was a witness, not trapped by my client, said that she, in fact, was very well versed in Backpage and could post ads. And my client's brother, Hensley, who again was testifying as a cooperator instead of getting over to tell the truth, said that Teja was also the one who posted the Backpage ads during the time he was involved with her. Or if he did it himself, he charged her for it. I'm sorry. I need to clarify again. As to the gun, I'm just looking at my notes here. I thought you conceded that he was sometimes violent with Victim 3, including twice pointing a gun at her. So this was Victim 3, as to which he was not acquitted. Once when she did not want to get out of bed to go to work. Another time when she was late for a customer. But then you say that this can't be the basis for an undue influence finding. Well, that was in the torum for Victim 3. And there was – the jury was presented with a use of force claim based on that testimony. And they acquitted him. As to use of force to Victim 3. Right. The acquittal generally was as to Victim 2, though. Right. Okay. Thank you. There are two theories relating to this. Yes. And Victim 2 was straight forward. All right. Thank you. The case that works for a total period of nine months. So there were three months that she admitted she was off after a felon was arrested. So that's a total of six months. And she was off and on after he was in jail. So that's the time period involved for her. The – Centora was there only – she lived there only for about a month in 2016 before my father was arrested for petty larceny. And she came back in April under Hansley's direction and was there probably another three weeks. So her period of working for a felon was extremely brief. And, again, I'm pointing these facts out because, as you know, the whole brief is about the sentencing first that I claim the district judge made and that his – the sentence, overall sentence, was extremely draconian. So two more questions about the sentencing. It is well settled that even in the face of an acquittal, the district court, if it makes findings by a preponderance, can take conduct into account in sentencing. Do you agree with that? I agree with that. All right. So the judgment did not base the use of acquitted conduct on his belief that it was established by the preponderance. He based the – oh, I'm sorry. I'm confusing the Centora and the diamond. He based the acquittal for diamond on vending, which I think was not a fair speculation. But the Centora, yes, but he didn't – he can use that. But I think that in this case, he shouldn't have used it. It was a very brief testimony. It wasn't corroborated by any of the other girls who had anything to do with my point. And so that's – I think he shouldn't be using that. Let me ask another question then. My understanding was that the district court found an offense level of 45, 43, 45, and a criminal history of four, which would give a life sentence guidelines range. And I understood that the defendant, your client, was advocating for an offense level of 38, but agreed to the criminal history four, although you said at the lower end. And that would have, again, given a range of 324 to 405 months. Your client got 300 months, correct? So that's below the range that the defense was advocating for? Well, the defense counsel actually did make some of the ordinance on that. So in my calculation, his offense level was 38, and I think that his criminal history category should be three based on errors and one error that was made by the judge. And I – so based on my arguments, I think the judge had obviously added a total of seven levels to my client's offense level and also added two extra criminal history points and then refused that report based on an overstatement of his – the only service prior to that, which was having a lot of extenuating circumstances. And if I could ask one other question while the red light is on. I understood you to be arguing that it was improper for the district court to apply the two-point enhancement for committing a crime while under a criminal sentence. Yes. My understanding – that struck me initially as plausible, given that he had not been sentenced at the time for the shoplifting conviction. He was just incarcerated after an arrest. Is that right? Yes. But my understanding is that the commentary to the guidelines, as well as the related guideline 4A1.2, says that if the time spent in pre-trial detention is countable towards the sentence ultimately imposed, that that should be considered that you're serving while under a criminal sentence. Is – do you agree that that's what the guidelines provide? Well, Your Honor, I don't have the guideline. You can, but I, of course, believe you when you're telling me. But he had not even pled guilty. The offense ended in May of 2017. He didn't plead guilty until the end of August, and was sentenced then. And they just applied some of the – But I think the notion was, wasn't he – when he pled guilty, wasn't he entitled to have the time spent in pre-trial detention counted towards his ultimate sentence? Yes, but he wasn't serving a sentence at the time. But the point is that the guidelines provide, I think, that if it is countable towards the sentence ultimately and a conviction results from that after that pre-trial detention, that it should be considered that the defendant was serving a sentence while committing the crime. Do you disagree with that interpretation? Again, I have to look at the guidelines. I know that that's one, but I just think that as a matter of logic, you can't be serving a sentence when you haven't even done the argument. All right. Thank you. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court. My name is Eleanor Carlo. I am the Assistant United States Attorney in the Southern District of New York who represents the government in this appeal, and I represented the government in this case in the district court. I'd like to start with the appeals argument that we just ended on, that the district court improperly applied two criminal history points under 4A1.1D. That and those criminal history points were properly applied by the district court. The defendant was detained after his December 2016 arrest. While incarcerated, he continued to engage in the incident offense. He was then subsequently convicted and sentenced after. He was not actually serving a sentence, though, while he was carrying out the conduct that you were just describing, right? He was ultimately sentenced in August 2017, and that sentence accounted for the time that he had spent incarcerated while he was engaging in the incident offense. And so when District Judge Furman sentenced him for this offense, in fact, he took into account that the defendant hadn't served a sentence at the time he committed the offense. So, although in normal parlance we wouldn't say he was serving a sentence because he hadn't been convicted of shoplifting yet, it's because of accountability towards the final sentence. And, for example, if he had been acquitted of the shoplifting charge, then that would not count as having committed the incident offense while serving a sentence. Is that right? Correct. What is the purpose of that enhancement then? The purpose of the enhancement, Your Honor, is that he was incarcerated while he was— No, no, no, no. What is the purpose of the enhancement? Is it to deter? Is it—what is the purpose of the enhancement? Because what you're telling me is that someone may not understand that they are under a criminal justice sentence, but nevertheless be susceptible or subject to this enhancement. In the government's view, it makes the conduct all the more reprehensible that while he was incarcerated, while he was in prison for a separate offense, he still engaged in the incident offense. Counsel, does the record reflect whether the sentencing judge on that shoplifting charge in fact awarded credit for time served? Yes, Your Honor. In August 2017, the sentencing judge for the state offense for the petty larceny said that he was being sentenced time served, which included the time that he was incarcerated and while he was engaging in the incident offense. And would a person who has been charged with a new offense and commits an offense while that charge is pending be considered a recidivist? Don't we normally consider recidivism as someone committing a new crime after having been convicted and sentenced and punished for a prior crime? To go to Judge Lohier's question about the purpose of that enhancement? Yes, Your Honor. Well, at the time that he was being sentenced by Judge Berman, in fact, he was a recidivist because he had been, at that time, convicted and sentenced for a petty larceny. Regardless, even assuming there was some error, even if it was not. Well, all right. I'm going to let you go with that then. Even assuming that there was some error, then what? Even if there were an error here, it was not plain error, which is the standard by viewing of this court. There's no decision directly on point. So that answers the question I was going to pose. We don't have a decision on quite this set of facts. Is that correct? That's correct. And therefore, it cannot be plain error for Judge Berman to have applied this particular provision of the guidelines. And regardless, it would be harmless error because, as Your Honor pointed out, the defendant with these two criminal history points would have nine criminal history points. He would be in criminal history category four. Even if he had not been awarded those two points, he would have seven criminal history category points, and he would still be in criminal history category four. Could you talk about the leadership enhancement, please? I was concerned about how his relationship with his brother, Hensley, and whether he actually had a leadership role over Hensley. Could you discuss that? Yes, Your Honor. The defendant, before he was incarcerated for this felony larceny offense, was directing his brother, his half-brother, Hensley, to help him by providing phones to the victim so that the victim could communicate with their clients. Then once Duquigny was incarcerated and he couldn't oversee the day-to-day activities of his victims, he recruited his brother to take an increased role in helping him manage the victims, as well as the defendant's friends, Bullock and Rockham. For example, he instructed Hensley and his half-brother to find what he called traditional spots, which are places where the victims could engage in sex trafficking. He ordered another co-defendant to give proceeds of the prostitution operation to him, and he gave explicit directions to make sure that the victims were engaging in prostitution to ensure that his co-defendant could oversee their hours and make sure they were seeing clients, because he could not while he was incarcerated. Okay. Thank you. Unless Your Honor has any further questions, the government rests on its mission. Thank you very much. So you've reserved two minutes for rebuttal. Yes, just quickly. In Rodriguez page 22, our cycle opens, and it's from this board, which says that an error in the calculations of guidelines is a serious procedural error, and that it satisfies the substantial rights upon a plain error test. And I am arguing that the judge made several errors, which made his starting point— disables us from applying plain error review to any and all guidelines calculations in sentencing cases. No, Your Honor. So what are you suggesting? It's a matter of law. I've sent this request to Helen, though, that procedural errors of calculations of guideline ranges are serious errors and that they ordinarily satisfy the substantial rights upon a plain error review. Well, all right. So put another way, that there is always plain error when there is an error in the calculation of guidelines. Is that the argument? Well— Are you suggesting we said that? I think it's—and maybe there will be back-and-forth with me, but when you have such a significant increase in levels here, and if this court agrees with these arguments, then I think it was a significant error, and the judge started at a place where he shouldn't have started. How do we assess significance? In other words, one point enhancement, two point—how do we assess that? Well, I'm suggesting that there was a total of seven. Well, no, with respect to particular errors. So we were just talking about the under-criminal sentence, and the government pointed out that there was no objection, and so plain error should apply. You are telling us that I think that's categorically a plain error, but maybe I've misunderstood the argument. Well, I think in this instance it would be. I think that when the judge has not had an opportunity to consider serious errors— and by the way, the leadership enhancement— But the reason that the judge has not had an opportunity to consider an error is because there was no objection. Yes, and in this case, Judge Harmon imposed the leadership enhancement on his own. The government didn't even ask for it. And I think that that's a four-level enhancement, and I think that constitutes a serious— How about the criminal justice, under-criminal justice sentence enhancement? Well, that goes to this criminal history category, which I think artificially blames him for the seven to nine points. So he should be under the low end of category four. And then his unlawful imprisonment conviction, which was the most serious he had, and it was from 2011, was really—there were so many exceptional circumstances that the defense counsel explained to the judge. He had to register as a sex offender, for example, because one of the minors— because the minor who was in the bedroom that he barricaded— I'm sorry, one of the people who barricaded himself in the bedroom was the minor. That's the only reason he had anything to do with sex. There was no physical harm. There was no sexual contact at all when he involved in a dispute between my client and a woman he'd been with for 10 years before he had a child. So I think that— And I'm trying to find it, but Lopez was a semi-order, I think. Yes, a semi-order. Is there a— Okay. Well, we have it. Thank you. And the leadership told us too, but I just want to speak to that. Hensley was a sex trafficker himself. He'd had several clients with his trafficking, and he'd done it for a much longer time than my client. And when he took over to try to find a place for Centura and Teja to continue working, it was in his interest. He was finding a place for his own girls, and then he just had them tag along as he was making money off them himself. It wasn't money that he gave to his wife. It was money that he gave to himself. There was absolutely no direction by my client to his brother. No control, nothing. Thank you very much. We'll reserve decision.